UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA,

        PLAINTIFF

v.

                                CRIMINAL ACTION NO. 1:10 CR71-001

MIKE AMMERMAN,

        DEFENDANT.

## SENTENCING MEMORANDUM OF DEFENDANT MIKE AMMERMAN

Respectfully submitted,

/s/ Marc S. Murphy
Marc S. Murphy
Michael M. Denbow
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400

COUNSEL FOR DEFENDANT,
MIKE AMMERMAN

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of February, 2012, a copy of the foregoing was served upon the following via ECF and email:

Hon. Chad Lamar
United States Attorneys Office
Northern District of Mississippi
900 Jefferson Avenue
Oxford, MS 38655-3608

/s/ Marc S. Murphy
COUNSEL FOR DEFENDANT

## **TABLE OF CONTENTS**

**PAGE**

I.     INTRODUCTION ...........................................................................................1

II.    THE ADVISORY GUIDELINE SENTENCE CALCULATED IN THE
PRESENTENCE REPORT IS SIMPLY INACCURATE. ....................................6

III.   A WORKING LIFE. ......................................................................................9

IV.   FARMERS TOBACCO AND THE TOBACCO INDUSTRY. ...........................12

     A.  The Master Settlement Agreement and State Escrow Statutes. .....................12

     B.  Between a Rock and a Hard Place. ...........................................................15

     C.  Efforts to Address The Problem. .............................................................20

     D.  Voluntary Report. ................................................................................21

     E.  Cooperation with Authorities. ...............................................................22

V.    THE APPLICATION OF 18 USC §3553(a) SENTENCING FACTORS
SUGGESTS AN ALTERNATIVE TO CONFINEMENT. ...................................22

     A.  The Nature and Circumstances of the Offense and the History and
Characteristics of the Defendant. ...........................................................24

         1.  The Nature and Circumstances of the Offense. ....................................21

         2.  The History and Characteristics of the Defendant. ................................24

     B.  The Purpose of Sentencing. ...................................................................25

         1.  Just Punishment and Deterrence. .......................................................25

         2.  Protection of the Public and the Need for Rehabilitation. .......................25

     C.  The Sentencing Guidelines and Guideline Policy Statements. ......................26

     D.  The Need to Provide Restitution. ............................................................32

VI.   CONCLUSION. ..........................................................................................34

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Gall v. United States*,
   552 U.S. 38 (2007)................................................................6,22,30,31

*Kimbrough v. United States*,
   128 S.Ct. 558 (2007).............................................................23,24,30,31

*Nelson v. United States*,
   555 U.S. 350 (U.S. 2009).........................................................6,22,23

*Rita v. United States*,
   551 U.S. 338 (2007)....................................................................23

*Trient International Corp. v. Kentucky*,
   467 F.3d 547 (6th Cir. 2006) ..........................................................16

*United States v. Adelson*,
   441 F.Supp. 506 (S.D.N.Y. 2006) ....................................................26

*United States v. Booker*,
   543 U.S. 220 (2005)........................................................... *passim*

*United States v. Buck*,
   324 F.3d 786 (5th Cir. 2003) ..........................................................27

*United States v. Campos-Maldonado*,
   531 F.3d 337 (5th Cir. 2008) ..........................................................20

*United States v. Graham*,
   146 F.3d 6 (1st Cir. 1998)..............................................................20

*United States v. Gutierrez-Hernandez*,
   581 F.3d 251 (5th Cir. 2009) ...........................................................6

*United States v. Handy*,
   2011 U.S. App. LEXIS 7390 (5th Cir. 2011) ........................................22

*United States v. Menyweather*,
   431 F.3d. 692 (9th Cir. 2005) ........................................................10

*United States v. Mueffelman*,
   400 F.Supp. 2d 368 (D. Mass. 2005) ................................................27

*United States v. Parris*,
   573 F.Supp. 2d 744 (E.D.N.Y. 2008) ...............................................26

*United States v. Rajendrasinh,*
   2011 U.S. App. LEXIS 18263 (4th Cir. 2011) ........................................................8

*United States v. Saucedo-Vianey,*
   2011 U.S. App. LEXIS 21219 (5th Cir. 2011) ........................................................6

*United States v. Serafin,*
   233 F.3d 758 (3rd Cir. 2000) ........................................................................30

*United States v. Stuart,*
   22 F.3d 76 (3d Cir. 1994) ............................................................................27

*United States v. Walters,*
   87 F.3d 663 (5th Cir. 1996) .........................................................................27

*Vibo Corp. v. Jack Conway, et. al,*
   594 F. Supp. 2d 758 (W.D. Ky. 2009), *appeal docketed,* No. 10-5403 (6th
   Circ. Jan 28, 2010) ...............................................................................14,15

## STATUTES

18 USC §2342(b) ...........................................................................................6

18 USC §3553 ..........................................................................................28,30

18 USC §3553(a) ..................................................................................... *passim*

28 USC §994(j) ...........................................................................................29

28 USC §994(m) ..........................................................................................29

IC 24-3-3 ...............................................................................................16

KRS 131.602 ............................................................................................16

KRS 131.604 et. seq. ....................................................................................16

ORC 109:8-1-03 .........................................................................................16

U.S.S.G. §2T4.1 ...................................................................................6,7,28,31

U.S.S.G. §2E4.1 .......................................................................................6,7,8

## OTHER AUTHORITIES

Fed. R. Crim. Pro. 32(d) ..................................................................................6

*Sourcebook of Criminal Justice Statistics* - 1888, tbl 6.34, at
   http://wwwbop.gov/news/quick.jsp4/ ...................................................................31

S. Rep. 98-225 (U.S. C.C.A.N. 3182 (1983)) ...............................................................32

*Supplementary Report*, Table 1(a) ..............................................................................24

U.S. Sentencing Comm'n, *The Federal Sentencing Guidelines: A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining*, 376 fig. 14 (1991) ..................................................................................31

U.S. Sentencing Comm'n, *2007 Sourcebook to Federal Sentencing Standards* Fig. D. (2007), at http://www.ussc.gov./ANNRPT/2007/table16.pdf............................30

U.S. Sentencing Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements, 17* (June 18, 1987)..........................................30

www.farmerstobacco.com ..........................................................................................12

## I.     INTRODUCTION.

Defendant Mike Ammerman respectfully submits this Sentencing Memorandum with respect to the application of 18 USC §3553(a) to the facts and circumstances of his offense. [1] Mike Ammerman has one request and this Memorandum has one goal: to persuade the Court that he should not be incarcerated. The Presentence Report ("PSR") calculates the advisory guideline sentence at 30 – 37 months, from an adjusted offense level of 19. This calculation is in error.[2] For the reasons presented in this Memorandum and to be discussed at the sentencing hearing, a sentence that includes incarceration would be greater than necessary to achieve the purposes of sentencing. As an initial matter, the government's calculated loss is not based on the actual unreported sales and therefore is not credible. In contrast, well before Bob and Mike Ammerman knew Farmers Tobacco was the subject of an investigation, they retained an independent auditor to determine the amount of unreported sales. The auditor determined that the federal excise tax owed was $1,023,048, not $2.9 million as the government asserts. This Memorandum also presents the reasons the advisory guidelines significantly overstate the seriousness of his offense, fail to capture the mitigating aspects of both his personal history and characteristics as well as the nature and circumstances of his crime, and yield a sentencing range that greatly exceeds what is needed to satisfy the purposes of sentencing. This is also particularly true in light of Mike Ammerman's history and characteristics and the nature and circumstances of the offense.

---

[1] Mike Ammerman's father, Bob Ammerman, will be sentenced the same day. *United States v. Robert Ammerman*, CR 1:10CR70.

[2] As explained in Section II, *infra.*, the correct advisory guideline level, after adjustments, is 4 (0 – 6 months).

The Court should sentence Mike Ammerman to probation because (1) it is the appropriate sentence, sufficient but not greater than necessary based upon the facts and circumstances of this case and this Defendant; (2) the *correctly-calculated* advisory guidelines offense level is 4 in Zone A (0 – 6 months); and (3) even if the Court accepts the PSR's incorrectly-calculated advisory guideline it should depart downward from it in light of the other equally-important 28 U.S. §3553(a) sentencing factors. The advisory guidelines for first-time, nonviolent white collar offenders are improperly harsh, unfairly favor confinement, and are based upon a fundamentally-flawed process originally utilized by the Sentencing Commission, the results of which have never been corrected.

The United States does not demand incarceration and will take no position on probation during the sentencing hearing.

Mike Ammerman is a good person who made a serious mistake. He accepts his guilt without reservation. There are no excuses, but there is an explanation. A very good one, as it happens, to the extent any explanation of a crime is a good one. As a very small manufacturer in the complicated and unforgiving world of Big Tobacco, Mike and his father and their small business found themselves between a large rock and a very hard place in the form of brutal retroactive requirements for payments to States under the tobacco Master Settlement Agreement that were grinding them and their business to death. They had to borrow millions to pay this unexpected financial burden for which they could not have prepared. In return their lender demanded a deal they should have, but did not, refuse. This was their crime.

The history of Mike Ammerman's and his father's family owned business - Farmers Tobacco Company of Cynthiana, Inc. ("Farmers Tobacco") - and the tax and

regulatory burdens and competitor pressures placed on such a small cigarette manufacturer by governmental authorities and Big Tobacco, respectively, play a significant role in Mike's story and the decision he made in 2006.  It is important, however to put Mike's decision in context and with respect to the many years he has followed the law in all respects.

Though Farmers Tobacco has a market share of less than one percent  (around .027) of the U.S. cigarette market, the Company, through Bob and Mike, has, over the course of its approximate ten-year history, paid almost $240 million in federal excise taxes to the federal Alcohol and Tobacco Tax and Trade Bureau ("TTB"), over $170 million to the Settling States under the tobacco Master Settlement Agreement ("MSA"), over $17.2 million in tobacco quota buyout payments to the U.S. Department of Agriculture, and over $2.1 million in payments to the U.S. Food and Drug Administration ("FDA").  Those payments left relatively little in profits for Farmers Tobacco.  Indeed, although the absolute dollar number of Farmers Tobacco's sales is substantial, practically all of this revenue went to taxes and other payments to federal and state governments – approximately $425 million.  The very low margin is a direct result of high taxes and other regulatory costs built into the price of cigarettes.  By way of comparison, the margins enjoyed by Big Tobacco, are much higher because of their longstanding, premium brands that can be priced much higher than Farmers Tobacco's relatively recent brands.

Prior to joining the MSA, the Company was put on notice that certain state law amendments governing the cigarette business would be applied retroactively, thereby requiring the non-Big Tobacco cigarette manufacturers such as Farmers Tobacco that

-3-

were not part of the MSA, to pay additional millions in escrow payments. The new escrow requirements operated as essentially an additional tax for past sales of cigarettes. Farmers Tobacco had remained fully compliant with all regulatory requirements, but could not have foreseen or prepared for this new, retroactively applied, effective tax.

As a result, Farmers Tobacco was forced to join the MSA under an arrangement with the Settling States whereby they agreed the Company would have a ten-year period in which to pay off a sum of approximately $21.2 million, a retroactively imposed payment obligation known as the "back-debt". Farmers' back-debt was imposed on top of the federal excise tax, MSA payments for current sales, tobacco quota buyout payments and FDA payments that the Company was also required to pay to federal and state governments. Because Farmers Tobacco operated with such a tight profit margin, the back-debt placed enormous additional pressure on the Company, compounded by aggressive tactics of Big Tobacco and other competitors.

Farmers Tobacco was able to make its back-debt payments during the first three years of the ten-year payoff agreement because it allowed for a much reduced payment in 2004, 2005, and 2006 (when the annual payments on principal were $500,000/year plus interest). In 2007 the annual payments required under the annual payment on principal jumped to $2.5 million per year. Farmers Tobacco had hoped its sales would increase enough to permit it to pay the substantial jump in annual payments required under the MSA, but unfortunately that did not occur, which created a chain reaction that ultimately led Bob and Mike Ammerman to the choices that bring them before this Court:

(1) either borrow money from Charles Wells to make the additional back-debt payment required by the Settling States under the MSA, under terms that required them to sell cigarettes to Mr. Wells "off the books", or

(2) be faced with the prospect of not being able to meet the Company's MSA obligations, which Bob feared ultimately would require him to shut down the business and lay off all of the employees.

Mike and his father chose to borrow the money from Wells, a decision they certainly now regret. In 2008, however, Farmers Tobacco ceased its activities with Mr. Wells, and took steps to pay taxes on its unreported sales: To that end, the Ammermans retained an independent auditor to determine the quantity of cigarettes sold to Wells and the taxes and regulatory costs associated with those sales. The audit took several months, and on May 1, 2009, in reliance on the findings of the independent audit, Farmers Tobacco made a Voluntary Disclosure of the unpaid tax to the United States. The Voluntary Disclosure was made before Bob and Mike knew that they were targets of a criminal investigation and almost one month before the Bureau of Alcohol, Tobacco and Firearms ("ATF") and Federal Bureau of Investigation ("FBI") executed a search warrant with respect to Farmers Tobacco's factory. Bob and Mike, through Farmers Tobacco, have now made full payment to the United States, including interest and penalties, as well as the Settling States. They have done so at a steep cost; paying an $8 million forfeiture; $5 million in federal excise taxes, interest and penalties; $1,368,118.80 million in additional payments to the Settling States under the MSA and another $48,587.61 in payment into escrow for the federal tobacco quota buyout.[3]

---

[3] Bob and Mike were ultimately able to make these payments because in 2011 Farmers Tobacco became entitled to a sufficiently large enough credit under the MSA, known as the "NPM Adjustment," to provide the company with sufficient funds to make early restitution. The NPM adjustment credit allowed the Company to use cash that otherwise would have gone to pay the MSA to instead be used to pay the taxes, interest and penalties owed to the TTB, Settling States and the FDA. Farmers Tobacco (along with most of the other cigarette manufacturers that are part of the MSA) and the Settling States are currently in a national arbitration with the Settling States over the validity of a portion of the NPM Adjustments. If Farmers Tobacco is unsuccessful in whole or in part in that arbitration, it likely will be required at a later date to pay the Settling States the amounts that Farmers Tobacco took as a credit in 2011 for its NPM Adjustments. Also, the NPM adjustment credit taken in 2011 was not available to Farmers Tobacco in 2007; otherwise, Farmers Tobacco might have paid the additional amount required for the back debt payment that year through application of the NPM adjustment credit rather than the conduct that is the basis for the sentences before this Court.

## II.     THE ADVISORY GUIDELINE SENTENCE CALCULATED IN THE PRESENTENCE REPORT IS SIMPLY INACCURATE.

Per *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Nelson v. United States*, 555 U.S. 350, 352 (U.S. 2009), this Court must accurately calculate the advisory guidelines and, after considering all the 28 USC §3553(a) factors, determine a sentence that is reasonable, but not greater than necessary, to address §3553(a) goals.  *See* also Fed. R. Crim. Pro. 32(d), *United States v. Gutierrez-Hernandez*, 581 F.3d 251, 256 (5th Cir. 2009) and *United States v. Saucedo-Vianey,* 2011 U.S. App. LEXIS 21219 (5th Cir. 2011).  The Court must first resolve disputed advisory guideline issues then, determine the advisory guideline range, decide whether the guideline suggested in the PSR is reasonable, appropriate and properly based upon empirical data and research, and address any factors that warrant departure or variance. *See, Gall,* 552 U.S. at 49-51.

Mike Ammerman objects to the offense level proposed in the PSR.[4]  The PSR relies upon an inapplicable advisory guideline subsection, and the resulting error dramatically and improperly increases Mike Ammerman's advisory guideline range.  The PSR utilizes the tax table at U.S.S.G. §2T4.1 to determine the advisory base offense level and it clearly should not.

The most analogous guideline for Mike Ammerman's violation of 18 USC §2342(b) is §2E4.1, reproduced here:

---

[4] This objection was preserved by the Defendant in his Objections to the Presentence Investigation Report, p. 5 at ¶14.

## CHAPTER TWO - OFFENSE CONDUCT

### PART E - OFFENSES INVOLVING CRIMINAL ENTERPRISES AND RACKETEERING

4. TRAFFICKING IN CONTRABAND CIGARETTES AND SMOKELESS TOBACCO

Historical Note: Effective November 1, 1987. Amended effective November 1, 2007 (see Appendix C, amendment 700).

§2E4.1. Unlawful Conduct Relating to Contraband Cigarettes and Smokeless Tobacco

    (a)   Base Offense Level: (Apply the greatest)

        (1)   9; or

        (2)   the offense level from the table in §2T4.1 (Tax Table) corresponding to the amount of the tax evaded.

*Commentary*

*Statutory Provisions: 18 U.S.C. §§ 2342(a), 2344(a).*

*Application Note:*

*1. "Tax evaded" refers to state and local excise taxes.*

*Background. The conduct covered by this section generally involves evasion of state and local excise taxes. At least 10,000 cigarettes must be involved. Because this offense is basically a tax matter, it is graded by use of the tax table in §2T4.1.*

Historical Note: Effective November 1, 1987. Amended effective November 1, 2007 (see Appendix C, amendment 700); November 1, 2008 (see Appendix C, amendment 724).

Advisory Guideline §2E4.1, in turn, requires application of the greater offense

level of nine (9) or the offense level from the tax table at §2T4.1 reproduced here:

## CHAPTER TWO - OFFENSE CONDUCT

### PART T - OFFENSES INVOLVING TAXATION

4. TAX TABLE

§2T4.1.   Tax Table

| | Tax Loss (Apply the Greatest) | Offense Level |
|---|---|---|
| (A) | $2,000 or less | 6 |
| (B) | More than $2,000 | 8 |
| (C) | More than $5,000 | 10 |
| (D) | More than $12,500 | 12 |
| (E) | More than $30,000 | 14 |
| (F) | More than $80,000 | 16 |
| (G) | More than $200,000 | 18 |
| (H) | More than $400,000 | 20 |
| (I) | More than $1,000,000 | 22 |
| (J) | More than $2,500,000 | 24 |
| (K) | More than $7,000,000 | 26 |
| (L) | More than $20,000,000 | 28 |
| (M) | More than $50,000,000 | 30 |
| (N) | More than $100,000,000 | 32 |
| (O) | More than $200,000,000 | 34 |
| (P) | More than $400,000,000 | 36 |

Historical Note: Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendment 237); November 1, 1993 (see Appendix C, amendment 491); November 1, 2001 (see Appendix C, amendment 617); January 25, 2003 (see Appendix C, amendment 647); November 1, 2003 (see Appendix C, 653).

The advisory guideline section makes it clear that the tax table should be used only in the case of evaded <u>state</u> taxes. Application Note 1, §2E4.1 states "Tax evaded refers to state excise tax." The payments utilized in the PSR, to the contrary, are all <u>federal</u> taxes and other <u>federal</u> payments, and not state and local excise taxes. The base offense level should, therefore, be 9, not 24.

There is no ambiguity or equivocation in the very clear language in the advisory guideline or the tax table. There is doubt that federal payments were not intended to be utilized in these calculations.

The tax table is inapplicable in this case and the base offense level should be 9. Analysis of the federal sentencing guidelines properly begins with the plain language of the guideline itself. *United States v. Rajendrasinh,* 2011 U.S. App. LEXIS 18263 (4th Cir. 2011).

Mike Ammerman has not been convicted of evading either state or local excise taxes. Importantly, there are no qualifiers or exceptions to the respective Application Notes to include the evasion of federal taxes. Counsel could find no reported case involving U.S.S.G. §2E4.1 that involved the evasion of *federal* taxes. Indeed, every reported case involves the evasion of state or local taxes. The U.S. Probation Officer also states he was "unable to find any case law dispositive of the issue." Addendum to the Presentence Report, p. 2. The payments made by the Ammermans (and their company, Farmers Tobacco) were all federal in nature, including the federal excise tax. Some of the required payments were not taxes at all, as will be further explained.

At a base offense level of 9, with a 2-level reduction for role in the offense and a 3-level reduction for acceptance of responsibility, the adjusted offense level is 4.

Without any other changes to the PSR (and before a motion by the U.S. Attorney for an adjustment for substantial assistance) and without any departure or variance by the Court, Mike Ammerman's advisory guideline level 4 sentence is squarely in Zone A of the Sentencing Table, where it should be.

There are many reasons Mike Ammerman should not be incarcerated. Those will be further explored herein. However, even a strict application of the *correct* advisory guideline does not require incarceration, and in fact contemplates an alternate sentence to include probation.

## III.     A WORKING LIFE.

The events that led to the loan the Ammermans accepted from Charles Wells are complex and will never happen again. Before these events, Mike Ammerman lived a model and very hardworking life. With the exception of this one mistake, he has continued to do so even while under indictment and while preparing for sentencing.

Mike Ammerman left college before he graduated to take care of his parents after his father had a heart attack, and to work with him to keep the small family business going. This occurred in April 1983. His mother became ill with cancer shortly thereafter and remains disabled. His sister Lisa was born with developmental disabilities and has never lived outside the home. He helps care for her, and his mother, today.

Mike dreamed of being an Air Force Officer and a pilot. Upon graduation from high school he received a full four (4) year Air Force ROTC scholarship, which he took to Georgetown College in Kentucky. His father's heart attack changed everything and he returned home. After he was forced to abandon his Air Force scholarship, the Defendant

began his working life in North Central Kentucky to care for his family and help save the family business. He never earned his degree.

He committed himself completely to the business and to his family, putting aside his own dreams. He knew he would never again leave Cynthiana, Kentucky. In 1983 the family business consisted of a farm on which they raised corn and tobacco and, eventually, a tobacco warehouse in which his father invested. Mike worked at the warehouse as a tobacco grader and in other positions. He worked with his father in these businesses all day every day. During this time he married the former Debra Fryman in 1986, to whom he is still married. They have three (3) children, Sarah, age 24, Rachel Marie, age 22, and Charles Robert, age 19, who works with his father and his grandfather in the Farmers Tobacco factory.

Post-*Booker*, this Court now has the discretion to consider important mitigating factors that were previously deemed "not ordinarily relevant" under the mandatory guidelines, such as age, education, vocational skills, mental and emotional conditions, employment record, and family ties and responsibilities, *United States v. Menyweather*, 431 F.3d. 692, 700 (9th Cir. 2005). Two (2) of these mitigating factors are worth specifically mentioning.

### 5H1.5  Employment Record

Mike Ammerman has worked hard his entire life. Importantly, his work has had a significant impact upon the lives of others, not just his family. At its height Farmers Tobacco employed about one hundred ten (110) people. Today it still employs 55, all of whom would be put at risk of losing their jobs if the Defendant and his father were imprisoned and Farmers Tobacco closed.

-10-

**5H1.6 Family Ties and Responsibilities**

The Defendant is the legal guardian and needs to take care of his ailing, elderly

mother and his disabled sister, in addition to his own family.  The commentary to the

5H1.6 policy statement provides relevant guidance:

> (B)  Departures Based on Loss of Caretaking or Financial Support.  A
>      departure under this policy statement based on the loss of
>      caretaking or financial support of the defendant's family requires,
>      in addition to the court's consideration of the non-exhaustive list of
>      circumstances in subdivision (A), the presence of the following
>      circumstances:
>
> (i)   The defendant's service of a sentence within the applicable
>       guideline range will cause a substantial, direct, and specific
>       loss of essential caretaking, or essential financial support, to
>       the defendant's family.
>
> (ii)  The loss of caretaking or financial support substantially
>       exceeds the harm ordinarily incident to incarceration for a
>       similarly situated defendant.  For example, the fact that the
>       defendant's family might incur some degree of financial
>       hardship or suffer to some extent from the absence of a
>       parent through incarceration is not in itself sufficient as a
>       basis for departure because such hardship or suffering is of a
>       sort ordinarily incident to incarceration.
>
> (iii) The loss of caretaking or financial support is one for which no
>       effective remedial or ameliorative programs reasonably are
>       available, making the defendant's caretaking or financial
>       support irreplaceable to the defendant's family.
>
> (iv)  The departure effectively will address the loss of caretaking
>       or financial support.

Mike and Bob Ammerman have important and irreplaceable caregiving

responsibilities at home.

-11-

IV.     **FARMERS TOBACCO AND THE TOBACCO INDUSTRY.**

    A.      **The Master Settlement Agreement and State Escrow Statutes.**

In the 1990's, the tobacco business was changing and the Ammermans, like other small tobacco farmers, were at risk of losing everything to the aggressive practices of the Big Tobacco[5] companies, and foreign markets and their use of cheap, reconstituted tobacco.  Mike and his father decided to invest in a few pieces of second-hand cigarette-making machines and hired local people to operate them in order to diversify their business so as to not rely, as farmers, exclusively upon sales to other manufacturers.  They wanted to try to control their own destiny. Ironically, as it turns out, the destiny of the business they worked so hard to build was ultimately always in the hands of forces they could not have anticipated, nor controlled.

The business began in 1999, and they sold their first cigarette in 2001.  The company's website can be found at www.farmerstobacco.com, and it is worth a look.  The company they built from scratch against all odds ultimately employed approximately 110 people before execution of the search warrant in this case.  These are people who would possibly not otherwise be employed, and certainly not with good manufacturing jobs, in the job-poor North Central Kentucky rural region.  Those who remain at Farmers Tobacco today rely upon the continued existence of the company for their livelihoods.

The business grew, however, against the backdrop of a political, legal and economic maelstrom in the tobacco industry.  A summary of this time in the industry is important to an understanding of the Ammermans' actions.  In November 1998, 46 States

---

[5] Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard were the four (4) largest tobacco manufacturers in the United States.  Reynolds subsequently acquired Brown & Williamson.  Together they enjoy a 97% market share.  Their impact upon the industry and their power within federal and state governments cannot be overstated.  "Big Tobacco," as they are known, is a fair and even understated label.

(all States except Mississippi, Florida, Texas and Minnesota, which had separately settled), the District of Columbia and 5 U.S. Territories (collectively the "Settling States"), entered into the tobacco Master Settlement Agreement (MSA) with the four (4) largest US tobacco companies."[6]

At the time of the settlement, manufacturers were divided, relative to the MSA, into Original Participating Manufacturers ("OPM's") and Non-Participating Manufacturers ("NPM's"). The four (4) largest manufacturers – Philip Morris, R. J. Reynolds, Brown & Williamson, and Lorillard – were the OPM's. At the time the MSA became effective, the OPMs collectively controlled approximately 97% of the domestic market for cigarettes. The economic and political power wielded by these industry giants cannot be overstated. To maintain their enormous market advantage Big Tobacco convinced the Settling States to require NPM's to pay into state escrow funds, based upon their sales. These escrow requirements ensure the companies not participating in the MSA have financial obligations similar to those participating. The MSA requires the Settling States to enact "escrow statutes." The Honorable Jennifer Coffman of the Eastern District of Kentucky explained this mechanism:

---

[6] The Settling States settled their lawsuits against the tobacco industry for recovery of their tobacco-related, health-care costs, and also exempted the companies from private tort liability regarding harm caused by tobacco use. In exchange, the companies agreed to curtail or cease certain tobacco marketing practices, as well as to pay, in perpetuity, various annual payments to the Settling States to compensate them for some of the medical costs of caring for persons with smoking-related illnesses. These payments were based upon the number of the manufacturer's cigarettes sold as measured by the excise taxes already applied to cigarette sales.

> In general terms, the escrow statute of the state obligates the tobacco companies that do not sign the MSA (NPM's) to make annual deposits into an escrow account, based on their sales volume in the state. The principal amounts are held in escrow for twenty-five (25) succeeding years and, if there is no judgment or settlement within a particular NPM on certain kinds of claims, the amounts remaining in escrow are to be returned to the NPM. However, as originally enacted, the escrow statute allowed an NPM to obtain a refund of the amount paid into escrow, to the extent that the amount paid to a state by the NPM exceeded the amount it would have paid that state under the MSA.

*Vibo Corp. v. Jack Conway,* 594 F. Supp. 2d 758, 768-69 (W.D. Ky. 2009), *appeal docketed,* No. 10-5403 (6th Cir. Jan 28, 2010). The Kentucky Attorney General explains how the mechanism worked in practice:

> Every Participating Manufacturer makes a single annual settlement payment based on its total shipments or sales of cigarettes in the United States during the previous year. That payment is allocated among Settling States according to percentages for each State ("Allocable Share"), which Allocable Share bears no relationship to the PM's actual sales in the State. The original Escrow Statutes, however, allowed each NPM to obtain an immediate release of any excess (a) of its annual escrow deposit for sales in a State over (b) what would have been the State's Allocable Share of the hypothetical MSA payment the NPM would have made for those sales had it been an SPM. This could effectively eliminate an NPM's escrow obligation. For example, an NPM that made 50 percent of its cigarette sales in Kentucky could obtain a release of the difference between (a) an escrow deposit based on 50 percent of its sales and (b) Kentucky's Allocable Share of 1.7611586% of the NPM's total sales, which difference would result in a release of about 96.5 percent of the NPM's escrow deposit in Kentucky.

*Id.* at n. 6.

Once the MSA was negotiated, it became apparent that there were many tobacco manufacturers that had not been sued, but who may be willing to join the MSA. To encourage these smaller tobacco companies to join the MSA, it was structured to give the

early-joining NPM's the opportunity to join the MSA with a reduced payment obligation. NPM's that joined the MSA within ninety (90) days of its initial execution are not obligated to make any payments under the agreement to the extent that their market share in a particular year is less than its 1998 market share (or 125% of its 1997 market share, if that is higher). *See* MSA §IX(1). If their sales do exceed this "grandfathered share," then they incurred payment obligations that are the same as the OPM's, calculated on a per-unit basis for all cigarettes sold above the floor amount of its grandfathered share. *Id*. The manufacturers that joined within ninety (90) days are referred to as "grandfathered" Subsequent Participating Manufacturers ("SPM's").

Manufacturers that chose not to join the MSA back in 1998, or any company that entered the market after 1998 and chose not to join the MSA (like Farmers Tobacco) operated as NPM's and were required to comply with each state's escrow statute. As those statutes were written, a company was required to pay into escrow on a per-unit basis, just as PM's paid into the MSA. Importantly, the escrow statutes also contained an "allocable share" provision which allowed companies like Farmers Tobacco to concentrate their sales in just a few states and then receive a refund of a portion of their escrow payments made in excess of the so-called "allocable share." It was this allocable share provision that allowed Farmers Tobacco, a family owned business in Cynthiana, Kentucky, to grow into one of the largest NPM's in the nation.

### B. <u>Between a Rock and a Hard Place.</u>

Farmers Tobacco could not have joined the MSA as a grandfathered SPM in 1998 or 1999 as it did not sell its first cigarette until 2001. Farmers Tobacco began selling cigarettes in March 2001. In 2001 it sold 276,000 cartons. In 2002, it sold 2 million

cartons. Sales continued to increase and, based upon those sales and the escrow rules that then-existed, the Ammermans invested $8 million in additional equipment, and were able to put many more people to work. Until 2003, Farmers Tobacco operated as a Non-Participating Manufacturer, not paying into the MSA but rather paying all other taxes and into the respective states' escrow funds pursuant to these states' escrow statutes.

Then the rules changed.

In 2004, Ohio, Indiana and Kentucky[7] amended their escrow statutes. *See* ORC 109:8-1-03; IC 24-3-3; KRS 131.602. More specifically, these states, including Kentucky, repealed the provision of their respective statutes that provided for a return to the NPM of a portion of the escrow payments in excess of the so-called "allocable share." *Trident International Corp. v. Kentucky*, 467 F.3d 547 (6th Cir. 2006).[8] With the stroke of a pen these rule changes required a company like Farmers Tobacco to increase its escrow payments from 35 cents per carton to approximately $3.00 per carton. Worse still, the amendment was applied *retroactively*. *See,* e.g.*,* KRS 131.604 *et. seq*. Moreover, regulators had advised companies like Farmers Tobacco that the escrow payments *were not* tax deductible. Among other things, this effectively eliminated price competition among cigarette manufacturers. Because Big Tobacco can produce cigarettes more cheaply than small, independent manufacturers, the playing field became permanently tilted in their favor. To add salt to the wound, Farmers Tobacco was advised by several

---

[7] The Ammermans had limited their sales to these states to comply with restrictions imposed through the states' escrow statutes.

[8] The Allocable Share provision allowed companies like Farmers Tobacco to operate in just a few states, pay into escrow as if they operated in all states, but then receive a refund which affectively recognized that the company did not operate in all states. After the repeal, NPM's lost the ability to receive a refund. The result: an NPM would be required to pay into escrow an amount similar to the payments made by PMs to the Settling States.

states that if it did not immediately comply with the amendment, the states would sue Farmers Tobacco for violation of the escrow statutes and seek treble damages.

The amendment placed an incredible burden on the Ammermans and Farmers Tobacco, as the company could not have foreseen that the increased escrow requirements would be imposed on cigarettes *already sold.* As Mike Ammerman explained, "We went to bed on Monday night owing $1.1 million in escrow and woke up on Tuesday morning owing over $9 million." Virtually overnight, the Ammermans were faced with limited options:

> (1) immediately find millions of *non-tax-deductible* dollars to pay into the states' escrow funds (or face a treble-damage lawsuits from the states);
>
> (2) join the MSA and assume a multimillion dollar (tax deductible) back debt for *all MSA payments they would have been making if they were participating manufacturers from the beginning of the MSA;* or
>
> (3) close their doors.[9]

To save their company and the jobs of all of their employees, they took the only "acceptable" option and joined the MSA as a non-grandfathered, participating manufacturer. At least joining the MSA would allow Farmers Tobacco to avoid the risk of lawsuits for treble damages.

The MSA, however, has its own onerous provisions. For example, every manufacturer, upon signing the MSA, must make any payment "that it would have been obligated to make in the intervening period had it been a signatory as of the MSA Execution Date," which is 1999 ("Back-Debt Obligation"). MSA §II(jj). Under this provision, therefore, any company that was in business as an NPM for any period of time

---

[9] Representatives from Ohio warned the Ammermans that even if they closed their doors, Ohio might still pursue an action for treble damages for escrow payments now required under the retroactively applied amendments.

before joining the MSA would be obligated to make a payment to the Settling States for every cigarette sold *prior* to their execution of the MSA.[10]  Fortunately, moneys Farmers Tobacco had deposited into escrow would transfer to the Settling States under the MSA. The difference between what was required by escrow statutes between 2001 and 2003 and what was required by the MSA, however, was significant.  In order to pay the difference, Farmers Tobacco was required to agree to sign a Note for $21.2 million. So, while the company was saved from lawsuits for treble damages, overnight Farmers Tobacco owed an MSA "back debt" of $21.2 million, which was financed for ten (10) years at 5%.  The first three years allowed for an annual payment of $500,000, plus interest, but beginning in April of 2007, the payment increased to $2.5 million, plus interest.  At the same time, Farmers Tobacco was required to make an annual payment for every cigarette it sold going forward.

As if this new financial obligation were not enough, in October, 2004, after the Ammermans had signed the $21 million MSA back-debt note, the federal tobacco support quota law was changed, which *also* had a retroactive effect upon Farmers Tobacco.  Without warning, in late October, 2004, the tobacco buyout legislation (the "Tobacco Buyout") was enacted.  The Tobacco Buyout required manufacturers to make an additional payment on each carton of cigarettes, to be paid on a quarterly basis.  The Tobacco Buyout was also retroactive, requiring a payment for sales made from October 1.  Farmers Tobacco raised it prices to cover this additional regulatory cost, but it was a struggle to come up with funds to pay for sales that had been made long before the legislation was even enacted.  Farmers accrued the required payments as sales were made

---

[10] Since the initial execution of the MSA, only two NPM's have endeavored to join the MSA.  Farmers Tobacco and Vibo Corporation d/b/a General Tobacco.  General Tobacco is now out of business, in large part due to the staggering back-debt obligations.

-18-

during the first two quarters of the fiscal year 2004-2005 and timely made the Tobacco Buyout payments. They continued to accrue the required amounts on sales into the third quarter, but in July of 2005, Farmers Tobacco was notified that the amount due had jumped from approximately $300,000 to nearly $800,000. Of course, Farmers Tobacco had never been put on notice of the increase and therefore had not accrued sufficient funds to cover this unexpected increase.[11]

The Ammermans could not have predicted or prepared for these enormous new and unexpected financial obligations. Even though they were hardworking, legitimate businessmen, they found themselves on the wrong end of Big Tobacco's effort to eliminate competition, the government's efforts to eradicate smoking, and the politics of both. They were looking at a completely different business model that included carrying a debt of millions of dollars. In order to cover these new regulatory costs, the company increased the prices of the cigarettes to cover the MSA back-debt payment and the MSA going forward payment. Now, instead of being one of the lowest priced, high quality brands, Kentucky's Best was priced higher than the cigarettes offered by non-compliant NPMs and many of the grandfathered SPMs, and only slightly less than the OPM's.

Importantly, Farmers Tobacco was promised that joining the MSA would not put it at a pricing disadvantage vis-à-vis other NPMs. Farmers Tobacco learned, however, that many, many NPMs operated outside the law and were not making payments into escrow as required. Accordingly, these rogue NPMs could price their products well below market price and severely undercut Farmers Tobacco. Moreover, the

---

[11] Bob and Mike later learned that the increase was due to the CCL forgiving $250 million in loans made to three cooperatives during that quarter. Ironically, one of those cooperatives, Flue Cured, went on to manufacture their own cigarettes, immediately after having its loans forgiven. Flue Cured is a competitor of Farmers Tobacco.

grandfathered SPMs were not required to pay a penny to the Settling States until they exceeded their grandfathered market share. This allowed those SPMs to sell millions of cigarettes without paying a penny to the Settling States. Over time, the result was disastrous. For example, in 2006, the regulatory costs alone were approximately $8.75/carton. When combined with the manufacturing cost and a wholesale price of $11.95/carton, Farmers was barely making a profit. Moreover, non-compliant NPM's could sell their product for significantly less than Farmers Tobacco was paying in regulatory costs alone.

### C. <u>Efforts to Address The Problem.</u>

In addition to these unexpected, retroactive payments, the Ammermans faced unfair competition from other small cigarette manufacturers that operated outside the law, avoiding required federal and state payments. The Ammermans complained to the authorities about these scoff-laws, which cost them customers and money. Farmers Tobacco was caught in the middle between Big Tobacco and its allies in the legislatures, and the small rogue companies that could make cigarettes more cheaply because they evaded taxes and other payments. Mike Ammerman and his father complained to the National Association of Attorneys General and, with their elected state representative, to the Kentucky Attorney General's office. They talked to anyone who would listen. They lacked political clout, however. Their good faith complaints accomplished nothing. At this point, their patience exhausted, and with the survival of their business on the line, Mike and his father made the decision that puts them before the Court now.

This decision is documented in the Information and in the PSR. When the states repealed the escrow statutes' allocable share provisions and the Ammermans were forced

to join the MSA as a non-grandfathered SPM, they suddenly had a $21 million, and

Interest at $9 million, back debt in addition to annual MSA payments going forward.

Even financed for ten (10) years, the $21 million back debt payment was an

overwhelming burden upon the small company for which they could not have planned.

All of this past is prologue to Bob Ammerman's regrettable decision, in which Mike

concurred, to accept the first loan from Charles Wells, and to repay him with off-the-

books product.  They meant no harm, and ironically, the reason for the off-the-book sales

was not for personal gain but to generate additional revenue to make payments to states

and territorial governments under the MSA.  But as often happens, one mistake led to

another, as off-the-books cigarette production led to false reporting which led to an

underpayment of taxes and fees.  Finally, it led to this, a sentencing hearing in federal

court in Mississippi.

Mike Ammerman has already paid heavily for his conduct in this case.  The

Ammermans have lost millions of dollars, their reputations, and more.

### D.      **Voluntary Report.**

Importantly, Mike and Bob began to report and offered to repay taxes on the

unreported sales even before they were aware the company was under investigation.  In

the winter of 2008, Mike and Bob were determined to try and establish just how many

cigarettes had been sold to Mr. Wells over the years.  To that end, they retained an

independent auditor to review the books and records, as well as the manufacturing

processes, to make that determination.  That process took several months, and on May 1,

2009, before the Ammermans knew they were targets of a criminal investigation and

nearly a month before the execution of the search warrant upon Farmers Tobacco, the

Ammermans submitted a Voluntary Disclosure to the TTB setting forth the results of the audit and the determination as to the amount of unreported sales. Through the Voluntary Disclosure, they offered to pay $1,023,048, which represented the federal excise tax owed on the cigarettes sold during the relevant time period. They had already voluntarily discontinued their relationship with Charles Wells despite his efforts to drag them deeper into trouble. They were trying to do the right thing.

### E.    Cooperation with Authorities.

Their efforts to do the right thing continued after the search warrant was executed at Farmers Tobacco. Mike and Bob Ammerman worked closely and at some length with federal agents in Kentucky to pursue various investigative leads. They tape-recorded telephone calls, and sat for hours of interviews. They did this despite a realistic fear of injury from retribution by certain of the targets of the federal investigation.

### V.    THE APPLICATION OF 18 USC §3553(a) SENTENCING FACTORS SUGGESTS AN ALTERNATIVE TO CONFINEMENT.

The advisory guidelines are not to be *presumed* reasonable. The Court must consider all of the sentencing factors of 18 USC §3553(a) and impose a sentence that is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in 18 USC §3553(a). *See Nelson*, 555 U.S. 350; *United States v. Handy*, 2011 U.S. App. LEXIS 7390 (5th Cir. 2011). As explained in Section II above, the correct base offense level in this case is 9, the adjusted offense level is 4 (before a motion for adjustment due to substantial assistance), and the sentencing range is 0-6 months. Furthermore, even if the Court erroneously accepts the PSR's flawed recommended sentence range, there are important circumstances in this case to cause the Court to consider a sentence well below

the mistaken advisory guideline range that will fulfill its goals, based upon "an individualized assessment based upon the facts presented." *United States v. Campos-Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008) (quoting *Gall*, 128 S.Ct. at 597). Even when properly calculated, the sentencing guidelines are not "presumptively reasonable" and are only advisory to the extent they are the product of "empirical data and national experience," and a sentencing court may conclude that a guideline yields a sentence "greater than necessary" to achieve §3553(a)'s purposes. *Kimbrough v. United States*, 128 S.Ct. 558, 575 (2007), *Rita v. United States*, 551 U.S. 338 (2007).

This Court inherently has greater access and familiarity "with the individual case and the individual defendant before him than the [Sentencing] Commission…." *Id.* at 597-98; *See also Nelson*, 555 U.S. 350 (sentencing guidelines are not presumptively reasonable). Based upon the facts of this case and this particular Defendant, the advisory guideline erroneously recommended in the PSR for the offense is far greater than necessary to achieve §3553(a)'s purposes.

Pursuant to *Booker*, the Court must consider each of the §3553(a) factors in fashioning an appropriate sentence. These factors are:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed–

    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct;

    (C)     to protect the public from further crimes of the defendant; and

    (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     [the applicable Sentencing Guidelines];

(5)     any pertinent [Sentencing Guidelines] policy statement ...;

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

*Booker*, 543 U.S. 259-60.

In order to achieve a sentence that is "sufficient but not greater than necessary," this Court must start with the minimum sentence permissible and add only so much additional punishment, if any, as is necessary to comply with §3553(a)'s purposes.  *See Kimbrough*, 128 S.Ct. at 575.  As discussed below, application of the relevant §3553(a) factors to Mike Ammerman's case establishes that a sentence without incarceration is sufficient but not greater than necessary.

A.     **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

1.     **The Nature and Circumstances of the Offense.**

Mike Ammerman helped Farmers Tobacco produce cigarettes off the books in order to repay a loan he and his father had obtained to make the enormous and unexpected MSA payments in order to try to save their company.  As a result they also underreported and underpaid taxes and other required payments.  They stopped before they were caught and took steps to pay the money back.

2.     **The History and Characteristics of the Defendant.**

Mike Ammerman has a spotless record and a lifetime of hard work and devotion to his family, and the family's business.  He made a serious but understandable mistake.

-24-

The voluminous letters (attached) from family, employees, and other community members attached show that Mike Ammerman is a devoted father and a hard-working business leader who is highly respected in his community. The letters are truly remarkable. His character is also evident in the manner he has taken full responsibility for his conduct in this matter.

### B.     The Purpose of Sentencing.

Section 3553(a) (2) lists four (4) purposes of sentencing, which can be summarized as: (1) just punishment; (2) deterrence; (3) protection of the public; and (4) rehabilitation. Under the parsimony principle, the sentence should be the minimum necessary to accomplish these purposes.

#### 1.     Just Punishment and Deterrence.

A sentence of probation is a just punishment for this offense and would adequately deter Mike Ammerman and others in the future. Mike Ammerman's federal felony conviction, the massive restitution, the search warrant raid on his business, and the impact this case has had on the business – if it survives at all – will resonate throughout the small community in which the Defendant lives for the rest of his life. His shame, his expense, his stress, and his record are sufficient to deter anyone learning of this matter from breaking the law.

#### 2.     Protection of the Public and the Need for Rehabilitation.

The facts of this offense as well as Mike Ammerman's personal characteristics place him at low risk to re-offend. The offense was a product of conditions that will not recur in the future. Mr. Ammerman has lost his reputation forever and is a convicted

felon. The circumstances of his offense strongly suggest that Mike Ammerman does not require incarceration to prevent him from committing another offense. He has no criminal history, stands convicted of a non-violent offense, is 48 years old, has a strong and stable employment history, attended college, and has strong family support, and ties to his community. In addition, due to the failing health of his mother, father and sister, he is needed at home.

### C.     The Sentencing Guidelines and Guideline Policy Statements.

The advisory sentencing guidelines overstate the scope and seriousness of Mike Ammerman's conduct, due to their much-criticized reliance on "loss" in establishing a base offense level. *See United States v. Parris*, 573 F.Supp. 2d 744, 754 (E.D.N.Y. 2008); *United States v. Adelson*, 441 F.Supp. 506, 512 (S.D.N.Y. 2006) (criticizing the "utter travesty of justice that can sometimes result from the Guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not combined by common sense.")

In Section II of this Memorandum, the Defendant explains why the amount of "loss" in this case doesn't matter for advisory guideline calculation purposes anyway because the applicable tax table applies only to state and local taxes (of which there are none). The default base level of 9 should be utilized as a result. However, to the extent a "loss" amount is nonetheless calculated and utilized, the advisory guidelines overstate the scope and seriousness of Mike Ammerman's conduct.

In paragraph 16 of the PSR it states "[f]or guideline calculations the loss attributed to the Ammermans will be the federal excise tax owed ($2,632,500.00) and the tobacco buyout assessment owed ($345,292.44), for a **total loss amount of**

**$2,977,792.44.**" (Emphasis in original.) Reference to the tax table at Sec. 2T4.1 establishes a *base offense level of 24* (51 – 63 months). This cannot be right, and it isn't. Indeed, according to the independent auditor, the tax loss is no more than $1,023,048. The Court recognized appropriate downward adjustments in instances where a defendant's loss calculations overstate the offense. *United States v. Mueffelman*, 400 F.Supp. 2d 368 (D. Mass. 2005); *United States v. Graham*, 146 F.3d 6 (1st Cir. 1998); *United States v. Stuart*, 22 F.3d 76 (3d Cir. 1994); *United States v. Walters*, 87 F.3d 663, 666 (5th Cir. 1996); *United States v. Buck*, 324 F.3d 786 (5th Cir. 2003).

Used appropriately, loss has a place in measuring the culpability of an offense as it reflects the harm inflicted. But the present advisory guideline exaggerates that factor. The advisory sentencing guideline range in the PSR is an example of the way in which the use of "loss" in the tax table can work an obvious injustice in particular cases. The PSR range has Mike Ammerman at a level 19 serving 30 – 37 months in prison after adjustments.

This blind reliance upon the mathematics of loss clearly results in an inappropriate sentence in Mike Ammerman's case. To put this in perspective, here is a sampling of base offense levels found elsewhere in the advisory sentencing guidelines. It cannot be seriously argued that Congress intended Mike Ammerman to be punished significantly more than a violent criminal or a statutory rapist, or as if he had killed someone, or extorted money through force or threat of violence.

| **Offense** | **Base Offense Level** |
|---|---|
| Aggravated Assault (2A2.2) | 14 |
| Criminal Sexual Abuse of a Ward (2A3.3) | 12 |
| Involuntary Manslaughter (2A1.4) | 12 or 18 if reckless; or 22 if by vehicle |
| Statutory Rape (2A3.2) | 18 |
| Domestic Violence (2A6.2) | 18 |
| Extortion by Force (2B3.2) | 18 |

The base offense level in Mike Ammerman's PSR (24) is so obviously out of whack because of the United States Sentencing Commission's mistake in not including probated sentences in their original data review, and the Commission's insistence – even in the face of absurd results like this – to rely upon loss and tax tables as the most important factor used to fix a prison sentence. Fortunately, *Booker* and its progeny allow this Court to sentence Mike Ammerman fairly and in accordance with Congress' original intent, and common sense.

The advisory guideline based upon the tax table at 2T4.1 inappropriately favors incarceration over probation, contrary to Congress' original intent, subsequent Supreme Court decisions, and the true goals of federal sentencing under 18 USC §3553. A non-violent first-time offender like Mike Ammerman, with no criminal history, a career, and a family and business to return to (and to support) should be a candidate for probation and considered for prison only in the presence of aggravating and unusual factors. The fact that a strict application of the PSR's advisory guideline drops Mike Ammerman squarely within Zone A, from which this Court must "depart" to even consider probation, is an

unfortunate example of the over-heated and out-of-synch state of white collar guideline ranges, including 2T, regarding taxes.

There is a history to this, which is relevant to the Court's consideration of Mike Ammerman's plea for probation. The defendant's request for probation wouldn't be considered a plea for *leniency* in the rational sentencing scheme originally envisioned by Congress and suggested today by the Supreme Court. Probation in this case wouldn't be "lenient." It would simply be correct and just.

In establishing the duties of the Sentencing Commission, Congress considered probation a distinct type of punishment, not a special benefit to all or only in extraordinary circumstances. It directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." Duties of the Commission, 28 USC §994(j). The Commission, however, ignored this mandate as a practical matter and created guidelines in which incarceration is presumed, and in which, for instance, there is no guideline range for which probation is the only sentence.

The white collar guidelines began life flawed and exaggerated, and got worse. The Commission was charged with gathering and analyzing then-existing empirical sentencing data upon which to base the first guidelines.

> This will require, as a starting point in its development of the initial sentencing guidelines for particular categories of cases, the Commission ascertain *the average sentences* imposed in such categories of cases prior to the creation of the Commission, and in cases involving sentences to terms of imprisonment, the length of such terms actually served.

28 USC §994(m) (Emphasis added).

Remarkably, and tragically, in estimating "average" sentences under past practice, the Commission examined *only convictions resulting in imprisonment*, disregarding nearly half of the sentences imposed during the relevant time period. *See,* U.S. Sentencing Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements, 17* (June 18, 1987) ("Supplementary Report"). As a result, the baseline data was incorrect and biased toward harsher sentences, especially in white collar and tax cases such as this one. This means that a sentence under these tax guidelines is much more likely to be greater than necessary.

The whole sentencing table is shoved upward as a result. It provides no guideline range where probation is the only recommended punishment and permits simple probation for a first-time, non-violent offender only at levels 1 – 8. After *Booker*, *Gall* and *Kimbrough*, this Court is encouraged to consider probation as the sentencing option it was always supposed to be and determine, in light of §3553 and this case, whether probation is actually statutorily *mandated* as the "minimally sufficient" sentence. *See United States v. Serafin*, 233 F.3d 758 (3rd Cir. 2000).

The Sentencing Commission's guidelines from their inception inappropriately pressured courts into imposing prison sentences and made it inappropriately difficult to sentence defendants to probation. The proof is in the pudding. *The percentage of federal defendants sentenced to a purely probationary sentence declined from approximately 48% in 1984 to 6.2% in 2007.* (Emphasis added.) U.S. Sentencing Comm'n, *The Federal Sentencing Guidelines: A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining*, 376 fig. 14 (1991); U.S. Sentencing Comm'n, *2007*

*Sourcebook to Federal Sentencing Standards*, 27 Fig. D. (2007), at

http://www.ussc.gov./ANNRPT/2007/table16.pdf.

The size of the federal prison population itself, which is 4½ times what it was when the guidelines became law, is further proof of the inappropriate impact of the sentencing guidelines. *See*, Katherine M. Jamieson and Timothy Flanagan, eds., *Sourcebook of Criminal Justice Statistics* – 1888, tbl. 6.34, Department of Justice, Bureau of Justice Statistics, Washington, D.C. USGPO, 1989; s*ee* http://wwwbop.gov/news/quick.jsp4/.

The original tax guidelines were no exception to the materially overstated white collar, first-time offender guidelines. Before the guidelines, only 30% of first-time offenders convicted after trial in tax cases involving loss of $5,000 or less were sentenced to prison. The guidelines were, thereupon, based only upon this 30% subset of offenders – only those who were imprisoned. *Supplementary Report*, Table 1(a) at 34. This original fundamental error permanently pushed these guidelines higher than appropriate. The tax table has been amended at least five (5) times, including in November 2001 when the base offense level pertaining to the "loss amount" in the Defendant's case was increased from 21 to 24, thereby compounding the Commission's originally inappropriately harsh sentence. *See* U.S.S.G. §2T4.1. The Commission relied upon incorrect "empirical data and national experience" in developing the guidelines. Therefore it is not an abuse of discretion for a court to determine that white collar guideline yields a sentence "greater than necessary." *Kimbrough*, 128 S.Ct. at 575; *Gall*, 128 S.Ct. at 597.

In the beginning, Congress provided specific guidance regarding the punishment of first-offenders convicted of non-violent offenses, concluding that they are not appropriate candidates for imprisonment:

> The placing on probation of …. a tax violator, may be perfectly appropriate in cases in which, with all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.
>
> This is not meant to imply that the Committee considers a sentence of imprisonment to be the only form of sentence that may effectively carry deterrent or punitive weight. It may be very often that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose.
>
> * * *
>
> Similarly, the Committee expects that in situations in which rehabilitation is the only appropriate purpose of sentencing, that purpose ordinarily may be best served by release on probation subject to certain conditions.

S. Rep. 98-225 (U.S. C.C.A.N. 3182, 3275 (1983)). As a result of the Supreme Court's post-*Booker* jurisprudence, however, sentencing courts should now disregard the Commission's improper presumption for confinement in appropriate cases, and sentence defendants per §3553(a), considering the guidelines as only one of the factors. In cases like Mike Ammerman's, these considerations confirm Congress' original intent that first-time non-violent offenders should not, except in certain cases, be confined.

### D.     The Need to Provide Restitution.

The Ammermans and Farmers Tobacco have already made substantial payments in the form of restitution. Indeed, even though the independent audit and Voluntary

Disclosure determined that the amount of excise tax due and owing was $1,023,048, Farmers Tobacco entered into an offer and compromise with the TTB in which Farmers Tobacco paid not just the tax owed, but interest and penalties as well, for a total payment of $5 million. Farmers Tobacco has also paid to the Settling States all undisputed amounts related to the unreported sales, pursuant to the provisions of the MSA. Finally, even though the FDA has never provided Farmers Tobacco with an assessment setting forth the amount owed on the unreported sales, Farmers Tobacco has nonetheless paid to the FDA the full amount of the Tobacco Buyout assessment on the unreported sales, plus interest.[12]

Mike and Bob, recognizing the severity of their actions, also agreed, and paid to the United States, $8 million in the form of a civil forfeiture.

At this time, Farmers Tobacco, Mike and Bob have made each of these entities more than whole.

---

[12] Before funds are transferred for payments under the Tobacco Buyout, the manufacturer receives an assessment setting forth the payment amount for the previous quarter. Farmers Tobacco has never received an assessment on these sales. Moreover, it appears that the Tobacco Buyout payment referenced in the presentence report is based on a reference in the plea agreement to the United States' statement that the loss does not exceed $5 million and in no way relates to any actual loss.

## VI.    CONCLUSION.

For the above reasons, Mike Ammerman respectfully requests a sentence of

probation.  It is the only sentence that is sufficient but not greater than necessary under all

circumstances of this case and this Defendant.

Respectfully submitted,

/s/ Marc S. Murphy
Marc S. Murphy
Michael M. Denbow
STITES & HARBISON, PLLC
400 West Market Street
Suite 1800
Louisville, KY  40202-3352
Telephone: (502) 587-3400

COUNSEL FOR DEFENDANT,
MIKE AMMERMAN

4655561_3.doc